UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| ELIZABETH C. MARTIN,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| v.   ) | Civil Action No. 4:05-CV-0080AS |
| ) | |
| JO ANNE B. BARNHART,   ) | |
| COMMISSIONER OF   ) | |
| SOCIAL SECURITY,   ) | |
| ) | |
| Defendant.   ) | |

**MEMORANDUM, ORDER, & OPINION**

Plaintiff, Elizabeth C. Martin, seeks judicial review of the denial of her claim for benefits and a period of disability under Title II of the Social Security Act. The Commissioner of Social Security found Ms. Martin not entitled to a period of disability nor Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416 (I), 423. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Ms. Martin applied for DIB on June 19, 2000, claiming an alleged onset date of disability of January 24, 1999 (Tr. 70-2, 371). Her claim was denied, along with her request for reconsideration (Tr.66 ). Ms. Martin then requested a hearing before Administrative Law Judge (the "ALJ") Albert J. Velasquez, which was conducted on August 30, 2002 (Tr. 13-22). During that hearing, the ALJ changed the onset date to March 9, 2000 (Tr. 14). The ALJ also denied her claim, and Ms. Martin's request for review was also denied (Tr. 5-7). Ms. Martin filed a civil action in the Northern District of Indiana, which granted the Commissioner's motion to remand to the Appeals Council for further proceedings (Tr. 451). The Appeals Council then remanded

1

the case back to the ALJ (Tr. 458-9).

A hearing was held before the ALJ on January 25, 2005, wherein Ms. Martin appeared with counsel along with Michael Blankenship, a vocational expert hired by Ms. Martin (Tr.437). Stephanie Archer, another vocational expert, also testified (Tr. 430). The ALJ issued a decision on April 28, 2005, finding that Ms. Martin was not disabled because she was still able to perform a substantial amount of jobs within the national economy despite her physical and mental impairments (Tr. 380). Ms. Martin's request for review was denied; upon that denial, the ALJ's decision became the final decision of the Commissioner (Tr. 348-9).

## I. Background

Statement of Facts

Ms. Martin was fifty-two years old at the time of the ALJ's decision, had earned her GED, and had completed some college course work (Tr. 371). She had also been employed by the Bureau of Motor Vehicles, where she was a team leader and translator, as well as having past experience as an editor of two newspapers at one point in time (Tr. 371, 430).

Medical Evidence

Ms. Martin has been the victim of five car accidents in the past seven years (Tr. 405-7, 416). The accidents occurred in January and November of 1999, April of 2000 and 2002, and November of 2004 (Tr. 416). She began developing back pain after the first of the series of accidents, and her condition began to worsen with each succeeding catastrophe (Tr. 419). She complained mainly of back and neck pain, along with pain in her shoulders, elbows, knees, hips and tingling in her fingers and hands (Tr. 419).

An x-ray taken in March of 2000 of Ms. Martin's cervical spine, pelvis and right knee

was normal (Tr. 292). A magnetic resonance imaging (MRI) scan taken in May of 2000 showed no disc herniation (Tr. 178). Furthermore, a computerized tomography (CT) scan of Ms. Martin's head was normal (Tr. 316-7). Examinations of Ms. Martin showed little decrease in range of cervical and lumbar motion, occasional numbness in hands and feet, multiple trigger points in shoulders, elbows, knees, and low back, no neurological deficits or radicular signs, full muscle strength, and intact fine finger manipulative abilities (Tr.172-3, 175, 245, 263-4, 280, 287, 342-3, 345-6, 479, 525-6).

On November 11, 2000, clinical psychologist David G. Jarmon, Ph.D., evaluated Ms. Martin (Tr. 551). He stated that Ms. Martin had an adjustment disorder with mixed anxiety and depressed mood, depressive disorder, chronic pain in her neck, shoulders, and back, and a GAF of 50/75 (Tr. 554).

When Dr. Jarmon examined Ms. Martin again on June 29, 2001, he gave essentially the same diagnosis; however, he did note that her GAF had diminished to 50/50 (Tr. 558). He also administered an MMPI-2 test to Ms. Martin (Tr. 557). However, because the test was taking such an inordinate amount of time for Ms. Martin to complete, Dr. Jarmon allowed her to take it home and finish it (Tr. 557). Ms. Martin returned the test to Dr. Jarmon several days later (Tr. 557).

On February 18, 2002, Dr. El Khalili noted that Ms. Martin was "totally unable to work" due to her major depression (Tr. 331).

On June 20, 2002, in a letter addressed to Vocational Rehabilitation services, Carolyn Kochert, M.D., noted that Ms. Martin's pain was largely myofascial in nature (Tr. 524). She recommended making several changes in Ms. Martin's diet to facilitate a lessening of the pain

3

(Tr. 524). She further opined that depression was playing a very large role in the pain sensations (Tr. 524).

On September 11, 2002, Dr. Kochert noted that Ms. Martin was "very tearful" and when she attempted to reason with Ms. Martin, there was little response (Tr. 526). Dr. Kochert's impressions were consistent with degenerative disk disease, depression and fibromyalgia and recommended that Ms. Martin continue taking pain medications as well as to seek counseling for the depression (Tr. 526).

On May 2, 2003, Michael Lockwood, M.D., noted that Ms. Martin had fibromyalgia and myofascial pain disorder (Tr. 476). He noted that the condition did not cause any deformity of the joints but that it was a chronic pain disorder that could affect sleep patterns and cause fatigue (Tr. 476). He recommended that Ms. Martin be restricted in her work environment, favoring a fifteen pound weight-lifting restriction as well as no swing or night shifts (Tr. 476). In concluding his diagnosis, he opined that he was "concerned about [Ms. Martin's] ability to function in the work environment, as she did seem significantly depressed" (Tr. 477).

On May 21, 2003, Dr. Jarmon examined Ms. Martin for the third time, noting that she had an adjustment disorder with depressed mood, a depressive disorder not otherwise specified, pain disorder associated with both psychological factors and a general medical condition, fibromyalgia with chronic pain, and a GAF of 55/55 (Tr. 562).

On January 14, 2005, Michael Bohlin, M.D., noted in his statement on Ms. Martin's condition that she was disabled based on objective medical findings (Tr. 515). He listed her diagnoses as myofascial pain disorder, fibromyalgia, depression, and gastritis (Tr. 514). He opined that Ms. Martin could sit for one hour, stand/walk for less than one hour, lift or carry one

4

to five pounds occasionally, could never squat, crawl, climb a ladder, kneel, crouch, handle or finger pick/pinch, could occasionally bend, reach above shoulder level and reach, and that she should never work around unprotected heights, moving machinery, marked changes in temperature, or around dust, fumes, and gases (Tr. 518). He concluded that Ms. Martin was totally incapable of working (Tr. 519).

On January 17, 2005, Dr. Lockwood noted in his statement that there were no objective medical criteria for establishing fibromyalgia and myofascial pain disorder and thus, in his answer to whether Ms. Martin was disabled according to objective medical evidence, he stated "not applicable" as to her disability (Tr. 580). However, he did note that if Ms. Martin's subjective claims of intense pain were credited then she would be disabled (Tr. 580). He opined that she was able to sit for eight hours, stand/walk for two hours, and lift or carry up to twenty pounds occasionally (Tr. 581). Furthermore, he noted that she should never bend, squat, or crawl (Tr. 582).

However, Dr. Lockwood noted in a supplemental statement dated January 17, 2005 that Ms. Martin's impairments equaled one of the listed impairments (Tr. 587). Furthermore, he stated that even if her impairments did not precisely equal one of the listed impairments then her ailments were "medically equivalent" to one of the listed impairments (Tr. 587).

<u>Hearing Testimony</u>

Ms. Martin noted that she was taking Mobic, Cymdalta, Wellbutrin, and Advair (Tr. 419). She complained of having excessive pain in her neck, shoulders, elbows, knee, lower back, hips, and her hand (Tr. 419). When she complained about her hand pain, the ALJ asked to see the hand so that he could examine it for himself (Tr. 421). Furthermore, she opined that she was

5

always crying, along with being depressed for no apparent reason (Tr. 420).  She noted that she had "good days" and "bad days"; the good days were ones where she could mop and do other household chores, while the bad days were ones where she could not even muster the fortitude to leave her bed (Tr. 421).

Stephanie Archer, a vocational expert, was asked to give a list of possible employment opportunities with what he believed to be Ms. Martin's RFC (Tr. 431).  The ALJ stated

> Let's assume a hypothetical individual the claimant's age, education and work experience, who's capable of work at the light and the sedentary exertion level.  Provided that the work required no more than lifting and carrying up to 10 pounds, or standing or walking more than six hours in an eight hour day.  Would require no more than occasional bending or squatting or climbing up stairs or ramps.  With no kneeling or crawling or climbing of ropes, ladders or scaffolds.  The individual should avoid walking on uneven surfaces.  Avoid work at unprotected heights.  Around dangers moving machinery, or operating a motor vehicle, or being around open flames or large bodies of water.  And the work should be simple and repetitive in nature with nor more than superficial interaction with the general public, coworkers or supervisors

(Tr. 431).

In response to the hypothetical put to her by the ALJ, Ms. Archer stated that there would be over 18,500 jobs that Ms. Martin could capably perform (Tr. 431).  When the attorney for Ms. Martin asked Ms. Archer about a hypothetical person with the RFC placed upon Ms. Martin by Dr. Bohlin, Ms. Archer stated that there would be no work in the national economy for that hypothetical person (Tr. 433).

Michael Blankenship, another vocational expert, stated that he had reviewed the record and interviewed Ms. Martin, placing a particular emphasis upon the opinions of Drs. Bohlin, Jarmon, and Kochert (Tr. 438).  He opined that Ms. Martin was unable to obtain and retain substantial gainful employment according to his vision of the record (Tr. 438).

The ALJ's Findings

      The findings of the ALJ are as follows:

1. The claimant met the disability insured status requirements of the Act at all times relevant to this decision.

2. The claimant was engaged in substantial gainful activity until March 9, 2000.

3. The claimant has not engaged in substantial gainful activity since March 9, 2000.

4. The medical evidence establishes that the claimant has "severe" impairments consisting of fibromyalgia, myofascial pain syndrome, major depression (moderate to severe) without psychotic features, an adjustment disorder with mixed anxiety and depressed mood, a depressive disorder not otherwise specified, a pain disorder associated with psychological factors and a general medical condition, and a personality disorder not otherwise specified with paranoid features; but that she does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant retains the residual functional capacity to perform a range of light exertional work defined as follows: lifting and/or carrying ten pounds frequently and twenty pounds occasionally; standing and/or walking, off and on, for six hours during and eight hour work day; intermittent sitting; using hands and arms for grasping, holding and turning objects; no more than occasional bending, squatting, or climbing of stairs or ramps; no kneeling, crawling, or climbing of ladders, ropes or scaffolds; avoid walking on uneven surfaces, work at unprotected heights, work around dangerous machinery, operating a motor vehicle, being around open flames and being around large bodies of water; the

work should be simple and repetitive in nature; and no more than superficial interaction with the general public, coworkers and supervisors.

6. The claimant's subjective complaints and allegations concerning the severity of her impairments are not reasonably consistent with the objective medical and other evidence of record.

7. The claimant is unable to perform her past relevant work as a team leader.

8. The claimant was a younger individual and is now closely approaching advanced age.

9. The claimant has a GED.

10. The claimant has no transferable skills.

11. Based on an exertional capacity for light work, and the claimant's age, education and work experience, Medical-Vocational Rules 202.14 and 202.21 would direct a conclusion of "not disabled".

12. Based on an exertional capacity for sedentary work, and the claimant's age, education and work experience, Medical-Vocational Rules 201.14 and 202.14 would direct a conclusion of "disabled" and "not disabled" respectively.

13. Although the claimant's restrictions and limitations do not allow her to perform the full range of light work, using Rules 201.14, 201.21, 202.14 and 202.21 as a framework for decisionmaking, there are a significant number of jobs in the State of Indiana which she could perform. Examples of such jobs at the light exertional level include clerk/cashier (12,000 jobs). Examples of such jobs at the sedentary exertional level include assembler (4200 jobs), packer (1100 jobs) and general office clerk (1200 jobs).

14. The claimant's capacity for light work has not been significantly compromised by

8

exertional and nonexertional restrictions and limitations.  Accordingly, using Rules 202.14, 202.21, 202.14 and 202.21 as a framework for decisionmaking, she is not disabled.

15. The claimant has not been disabled, within the meaning of the Social Security Act, at any time relevant to this decision.

The ALJ's Decision

Based upon the Title II application filed on June 19, 2000, the ALJ found that "the claimant is not entitled to a period of disability or disability insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act" (Tr. 378-9).

## II. Standard of Review

This court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel,* 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Williams v. Apfel,* 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000). *See also, Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).

With respect to credibility determinations, the ALJ is in the best position to

observe the demeanor and veracity of the testifying witnesses. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### III. Discussion

"Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th.Cir.1998). Under section 423(c)(1)(B)(1), it is well established that to receive benefits, a disability must have begun or had its inception during the period of insured status. *Bolinger v. Barnhart,* 446 F. Supp. 2d 950, 954 (N.D. Ind. 2006) (citing *Bastian v. Schweiker*, 712 F.2d 1278, 1280 (8th Cir. 1983). A claimant has the burden of establishing that she is disabled within the meaning of the Social Security Act on or before the date her insured status expired. *Estok*, 152 F.3d at 640; *Meredith v. Bowen*, 833 F.2d 650 (7th Cir.1987); *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir.1985); *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984); *Jeralds v. Richardson*, 445 F.2d 36, 39 (7th Cir.1971). "The law requires that a claimant demonstrate her disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." *Jeralds,* 445 F.2d at 39. Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability benefits." *Couch v.*

*Schweiker*, 555 F.Supp. 651, 654 (N.D. Ind.1982). Plaintiff bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir.1976) *(citing, Jeralds,* 445 F.2d at 38-39).

The claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations to the Act create a five-step inquiry in determining whether a claimant is disabled. As previously discussed, the ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy.

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520*).* The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger*, 446 F. Supp. 2d at 955.

Ms. Martin's first allegation of error concerns the hypothetical posed by the ALJ to Ms. Archer, one of the vocational experts.  Ms. Martin alleges that the hypothetical created by the ALJ was not the same as the actual RFC that the ALJ found, making the determination at step five of the sequential analysis flawed.  Pl. Br. at 6.  However, though there might have been differences between the hypothetical and the actual RFC assessment, it does not necessarily mean

11

that the difference is fatal.  Indeed, as is noted by the Commissioner, the hypothetical was actually more restrictive concerning the weight limits than the RFC assessment. Def. Br. at 10.

However, there were several differences between the hypothetical and the RFC assessment.  First, there was no mentioning of "intermittent sitting" in the hypothetical put to Ms. Archer.  Pl. Br. at 7.  However, in the span of an eight-hour work day, it is understood that sitting will be interspersed with standing and walking.  Indeed, breaks are built into the day so that "intermittent sitting" becomes an inherent aspect of standing/walking.  Second, Ms. Martin states that the hypothetical did not "restrict standing and/or walking to 'off and on'".  Pl. Br. at 7. Again, this is easily dispensed with; the same logic that applies to "intermittent sitting" as innate to standing/walking during the average work day applies to the restriction of standing and/or walking.  The last two differences alleged by Ms. Martin, that the ALJ did not place restrictions on gripping and handling and that he did not take into consideration the amount of days missed by the hypothetical employee, are not really differences at all.  These were not mentioned in the RFC assessment; therefore, it is only natural that they should be absent from the hypothetical put to Ms. Archer.

Ms. Martin's first volley being without merit, the court moves to her next argument.  Ms. Martin alleges that the RFC findings made by the ALJ "were wholly inconsistent with the record."  Pl. Br. at 9.  She notes that the opinions of Drs. Bohlin and Lockwood, while not being exactly identical as to particulars, both opined that Ms. Martin was disabled. Pl. Br. at 9-10. When addressing the statements of both Drs. Bohlin and Lockwood, along with Drs. El Khalili and Jarmon, the ALJ gave reasons for deeming them either incomplete or entirely invalid (Tr. 375-7).

As to Dr. Bohlin, the ALJ stated that the ability of Ms. Martin to complete the MMPI-2 test meant that she was more capable than Dr. Bohlin had supposed (Tr. 377). Furthermore, he stated that because there were no "significant and persistent neurological deficits, restrictions and limitations" other than the ones he mentioned in his RFC, the "objective medical evidence" did not support Dr. Bohlin's assessment (Tr. 377).

As to Dr. Lockwood, the ALJ simply noted that the doctor had only seen Ms. Martin once, evidently disqualifying his opinion as deserving of consideration because of the small amount of contact between doctor and patient (Tr. 376). The ALJ also mentioned the MMPI-2 test and the lack of persistent neurological deficits in discounting Dr. Lockwood's opinion (Tr. 376).

As to Dr. El Khalili's assertion that Ms. Martin was completely incapable of working, the ALJ stated the doctor did not provide any "specific restrictions or limitations" (Tr. 377). Furthermore, he stated that any restrictions beyond what the ALJ had found were not supported by substantial evidence and thus, Dr. El Khalili was beyond the realm of where the evidence could take him when he made his assertion (Tr. 377).

As to Dr. Jarmon, the ALJ again focused on the MMPI-2 testing to show that Ms. Martin was capable of "concentrat[ing] beyond what Dr. Jarmon surmises she can do" (Tr. 377). Also, he noted that Dr. Jarmon's statement that Ms. Martin could not work continuously for six hours was perfectly consistent with the ALJ's RFC assessment because an employee would never work for six hours straight; there were breaks built into the day to forestall that possibility (Tr. 377).

It should be apparent from the review delineated above that the ALJ discounted every single medical expert, without exception, and embraced a somewhat etiolated view of the

13

evidence. Indeed, it appears that the universe of factual data had been restricted to the MMPI-2 test, which was essentially a "take-home" test for Ms. Martin, and to his own RFC, which was a conclusion that was meant to be based on the objective evidence (Tr. 557).

The ALJ multiplied his bald assertions, stating several times that each doctor's opinion was contrary to either the ALJ's own RFC, the MMPI-2 test, or the lack of any persistent neurological deficits (Tr. 375-7). While this was certainly a very efficient method of conclusion-seeking, it did not "articulate at some minimal level [the ALJ's] analysis of the evidence," simply because there was no analysis. *Clifford*, 227 F.3d at 872.

The ALJ is required to "build an accurate and logical bridge between the evidence and the result." *Shramek*, 226 F.3d at 811. In this case, the ALJ merely made conclusory statements regarding the medical evidence presented by the chorus of doctors. Indeed, it seems that the ALJ purposely stopped his ears with his own RFC finding and the MMPI-2 test, not allowing himself to be swayed by the assertions of the medical experts. While his resolve is impressive, it is not resolve that his decision must be marked by, but substantial evidence.

However, the Commissioner argues in her brief that the ALJ "carefully considered and discussed each of these opinions" in the course of his opinion. Def. Br. at 15. Furthermore, the Commissioner warns against reversal, stating that "a reviewing court should not disturb an ALJ's credibility determination as long as there is some support in the record." Def. Br. at 15 (internal citation and quotations omitted).

As stated above, conclusory statements do not equal analysis and careful examination. As to disturbing an ALJ's decision, while this court does not lightly overturn the decision of an ALJ, it also does not simply "rubber-stamp the Commissioner's decision. *Clifford*, 227 F.3d at

869.  Therefore, because the ALJ ignored the doctor's opinions without giving substantial evidence as to why he did so, his RFC determination was not supported by substantial evidence. Thus, Ms. Martin's other arguments need not be considered.

## IV.  Conclusion

Thus, because the ALJ failed to support his findings with substantial evidence, his decision is **REMANDED** for further proceedings consistent with this opinion.  Furthermore, the Court strongly recommends that the Commissioner assign a new ALJ to handle any additional proceedings, because this is the second chance that this ALJ has had to handle this particular matter.  *See Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 357 (7th Cir. 2005); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

**SO ORDERED**.


Date: March 21, 2007                                        S/ ALLEN SHARP
                                                            **ALLEN SHARP, JUDGE**
                                                            **UNITED STATES DISTRICT COURT**